UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                    :
GEORGE GRIFFITHS, *et al.*,                         :
                                                    :        CASE NO. 1:09-CV-1011
                    Plaintiffs,                     :
                                                    :
vs.                                                 :        OPINION & ORDER
                                                    :        [Resolving Doc. No. 34]
OHIO FARMERS INS. CO., *et al.,*                    :
                                                    :
                    Defendants.                     :
                                                    :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this employee benefits case, the Defendants move for summary judgment on the Plaintiffs'

claims for benefits and breach of fiduciary duty. [Doc 34.] In this action, Plaintiffs George Griffiths

and Betty Collett seek to represent a class of individuals who retired from Ohio Farmers Insurance

Co. ("Ohio Farmers") under a 1999 Special Retirement Benefit.  The Plaintiffs claim that Ohio

Farmers induced them to retire early by promising certain lifetime profit-sharing and life insurance

benefits under the Westfield Earnings Bonus Plan ("WEB Plan" or "Profit Sharing Plan") and Ohio

Farmers Insurance Co. Life Insurance Plan ("Life Insurance Plan"). The Plaintiffs further allege that

Ohio Farmers has refused to pay these promised benefits and now seek a declaration of their rights

under the plans, an injunction prohibiting the plans' modification or termination, and restitution for

unpaid benefits.

For the following reasons, this Court **GRANTS IN PART** and **DENIES IN PART** the

Case No. 1:09-CV-1011
Gwin, J.

Defendants' Motion for Summary Judgment.

## I. Background

Plaintiffs George Griffiths and Betty Collett worked for Defendant Ohio Farmers Insurance Company until their retirement at the end of 1999.  The Plaintiffs claim that Ohio Farmers induced them to retire early by promising certain lifetime and unchangeable benefits under two existing benefit plans: the Profit Sharing Plan and the Life Insurance Plan.  The Plaintiffs argue that Ohio Farmers has refused to pay these benefits as promised, specifically by terminating the Profit Sharing Plan and amending the Life Insurance Plan.

Defendant Ohio Farmers established the Life Insurance Plan and the Profit Sharing Plan—or their predecessors—in the 1960s. [Doc. 35-4 at 15.]  Plaintiff Griffiths began participating in the plans when he joined Ohio Farmers in the 1970s. [Doc. 35-4.]  Similarly, Plaintiff Collette has participated in the plans since the 1980s. [Doc. 35-5 at 6.]

In 1999, Defendant Ohio Farmers announced  plans to reduce benefits under its existing benefit plans, including the Profit Sharing and Life Insurance plans.  Near the same time, the company also offered a 1999 Special Retirement Benefit—a buy-out package—to employees near retirement age.[1]  To encourage early retirement under the 1999 Special Benefit, the Defendants told participating employees that they would not be subject to many of the announced benefits changes. [Doc. 34-20 at 14-15.]

Ohio Farmers first announced both programs in a May 1999 Newsletter.  As to the 1999 Special Benefit, the May newsletter stated: "Westfield will offer a Special Retirement Benefit to employees who are 55 years of age with 10 years of service as of December 31, 1999.  Eligible

------

[1]Ohio Farmers had offered a similar buy out in 1997. [Doc. 35-7.]

Case No. 1:09-CV-1011
Gwin, J.

employees will receive a special portfolio on June 1, 1999, describing this benefit." [Doc. 35-11 at 6.] Regarding the changes to the benefit plans for future retirees who chose the early retirement, the newsletter stated:

> **Retiree Group Life**
> *Future Retirees*: Eligible employees who retire before January 1, 2000, will automatically receive life insurance.  The amount of the death benefit paid will continue to be *reduced by 5% each year* on the 66th through 75th birthday for a minimum benefit of $10,000.  Regardless of age, the benefit will not be reduced *below $10,000.*
>
> Eligible employees who retire on or after January 1, 2000, will automatically receive life insurance. The amount of that death benefit will be *reduced by 10% each year* on the 66th through 75th birthday, but will not be reduced *below $15,000.*
>
> **Profit Sharing**
> *Future retirees:*
> Employees who retire prior to January 1, 2000, will participate in the Profit Sharing Plan for their life, and if they die prior to their spouse, their spouse will participate in the Profit Sharing Plan for his or her lifetime . . ..
>
> Employees who retire between January 1, 2000, and December 31, 2004, and who are at least 50 years of age with 5 years of service as of January 1, 2000, will participate for life in the Profit Sharing Plan *with an annual maximum award of 20% of ending effective salary*. The employees surviving spouse will be eligible to participate for five years after retiree's death. . . .

[Doc. 34-15 at 7-8] (emphasis added).

The Defendants also distributed a June 1999 Newsletter that confirmed: "If you retire ***before*** January 1, 2000, you will receive benefits under the current retiree group life insurance plan, which reduces the amount of benefit by 5% each year on the 66th through 75th birthday.  However, your benefit will not be reduced below $10,000." [Doc. 34-16 at 7.]  The newsletter also noted that the company was offering a special retirement benefit and that eligible employees should have already received a separate portfolio with details. [Doc. 34-16 at 6.]

-3-

Case No. 1:09-CV-1011
Gwin, J.

Both Plaintiff Griffiths and Plaintiff Collette received this separate portfolio, entitled "Information Concerning A Special Retirement Benefit," on June 1, 1999. [Doc. 34-20.] Similar to the newsletters, the portfolio compared the benefits available to employees who retired prior to January 1, 2000, with the benefits available to employees who retired after that date. For example, under "Profit Sharing," the portfolio states:

> Employees who retire prior to January 1, 2000, will continue to participate *for their lifetime* in the Profit Sharing Plan based on their salary for the last full calendar year of employment. If married for 20 years, your surviving spouse will participate for their lifetime at 50% of the retiree's benefit.
>
> . . .
>
> Effective January 1, 2000, retiree and retiree spouse participation in profit sharing *will gradually be eliminated* beginning January 1, 2000, as follows . . ..

[Doc. 34-20 at 14] (emphasis added). In the same section, the portfolio also alerted readers that "The Profit Sharing Plan continues to include a provision by which the Company may curtail or revoke the plan at any time. All participation referred to herein is dependent upon the Plan continuing in its present or amended form." [Doc. 34-20 at 14.]

For employees who accepted the 1999 Special Benefit and retired prior to January 1, 2000, participation in the Life Insurance Plan would:

> [C]ontinue at 2.5 times your annual salary as of your last day of active employment until you reach age 66. At that time, your group life insurance will decrease 5% and continue to decrease by this amount until you reach age 75. At this time, your group life insurance will be one-half of the amount immediately prior to your retirement.

[Doc. 34-20 at 15.] In contrast, for employees who retired *after* January 1, 2000, the life insurance benefit would decrease *ten percent* per year beginning at age sixty-six until it reached a "floor" of $15,000. [*Id.*]

-4-

Case No. 1:09-CV-1011
Gwin, J.

> The final page of the portfolio contained the following disclaimer:
>
> Ohio Farmers Insurance Company fully intends to continue its retirement and welfare benefits plans but reserves the right to amend, modify or terminate any of the plans or benefits, in whole or in part, at any time for any group of people or to modify the groups of participants eligible for these benefits. The authority to make any changes to the benefit plans rests with Ohio Farmers Insurance Company.

[Doc. 34-20 at 17.]

In order to accept the 1999 Special Benefit, employees had to sign a form and return it to the Defendants' benefits department by July 23, 1999.  [Doc. 34-20 at 3.]  After that date, the employees had until August 2, 1999, to revoke their acceptance. [*Id.*]  Ultimately, both Plaintiff Griffiths and Plaintiff Collette accepted the 1999 Special Benefit and retired from Ohio Farmers. [Doc. 34-21, 34-22.]

Eight years later, on December 18, 2007, the Ohio Farmers board of directors eliminated the company's existing Profit Sharing Plan and established a new Annual Incentive Compensation program. [Doc. 34-4 at 15.]  Retirees were not eligible to participate in the new program.  Similarly, on September 16, 2008, the Ohio Farmers board of directors approved a reduction in retiree benefits under the Life Insurance Plan. [Doc. 34-5 at 9.]  For the Plaintiffs, this change meant that their death benefit dropped from 2.5 times salary (reduced by five percent per year from age 66 to 75) to a flat benefit of $15,000.

On May 1, 2009, the Plaintiffs filed their Class Action Complaint in this Court, seeking restoration of their benefits under the terms of the newsletters and 1999 Special Benefit. [Doc. 1.] After this Court granted in part the Defendants' motion to dismiss, [Doc. 24], the parties conducted discovery, and the Defendants filed the instant motion for summary judgment. [Doc. 34.]  The Plaintiffs oppose the motion, [Doc. 35], and the Defendants have replied. [Doc. 38.] Accordingly,

Case No. 1:09-CV-1011
Gwin, J.

the motion is ripe for ruling.

## II. Legal Standards

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "A fact is material if its resolution will affect the outcome of the lawsuit." *Martingale, LLC v. City of Louisville,* 361 F.3d 297, 301 (6th Cir. 2004) (citing *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986))).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323 (quoting FED. R. CIV. P. 56(c)). However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *See id.* at 586. Nor can the nonmoving party rely upon the mere allegations or denials of its pleadings. FED. R. CIV. P. 56(e).

Case No. 1:09-CV-1011
Gwin, J.

In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *Thomas v. Cohen,* 453 F.3d 657, 660 (6th Cir. 2004) (citations omitted).  "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968)).  Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Martingale,* 361 F.3d at 301 (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.,* 96 F.3d 174, 178 (6th Cir. 1996)) (internal quotations omitted).

### III. Analysis

The Plaintiffs allege that the Defendants have failed to provide benefits due under the Life Insurance and Profit Sharing plans, in violation of the Employee Retirement Income Saturday Act of 1979 ("ERISA") §502(a)(1)(B) & (a)(3).  [Doc. 1 at 10.]  The Plaintiffs further claim that the Defendants breached their fiduciary duties to the class members by distributing misleading information about the duration of the plan benefits. [Doc. 1 at 11.]  Moving for summary judgment, the Defendants argue that the documents on which the Plaintiffs rely do not constitute plan documents and that the "Reservation of Rights" contained in the plans and portfolio negate any promise to provide "lifetime" benefits.

The Court thus examines what language governed the Plaintiffs' benefits upon their retirement and whether Ohio Farmers potentially misled the Plaintiffs about the extent of their benefits.

-7-

Case No. 1:09-CV-1011
Gwin, J.

### A. Benefits Due

The Plaintiffs' claim for benefits due under the Life Insurance and Profit Sharing plans presents two questions: (1) do the newsletters and summary portfolio constitute amendments to the existing plans, and (2) if so, do those amendments provide the benefits the Plaintiffs claim in this case?  Because the Court finds that the plans, even as allegedly-amended, do not guarantee lifetime or unchangeable benefits, the Court assumes without deciding that the newsletters and portfolio are Plan amendments.

Employers "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright*, 514 U.S. at 78.  Because the Plaintiffs recognize this principle and concede that the relevant documents contain reservation of rights language, they essentially contend these reservations are ineffective against the Defendants' promise of "lifetime" benefits.

Though not an implausible argument, this interpretation impermissibly reads the reservation of rights language out of the plans.  As the Sixth Circuit has held, when faced with potentially-conflicting language in an ERISA plan, "The Court should . . . interpret each provision in question as part of the integrated whole." *UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983).  Applying this standard, the court of appeals has held that promises of "lifetime" benefits, when modified by a reservation of rights clause, indicate only the duration of the benefits under the plan as it exists at that time. *See Musto v. Am. Gen Corp.*, 862 F.2d 897 (6th Cir. 1988); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998).

For example, in *Musto* the court of appeals reversed a district court's finding that a promise of continuing benefits negated reservation of rights language.  Construing the allegedly-conflicting

Case No. 1:09-CV-1011
Gwin, J.

language, the court of appeals held that the plan document's description of the benefit was merely that: a description of the benefit under the plan as it existed at that time. 861 F.2d at 906.  Because the employer also reserved its right to terminate or modify the plan, it could change the existing benefit without violating ERISA. *Id.*

More recently, the court in *Sprague* examined plan documents that stated both that the employer could "amend, change or terminate" the plans and that the employer would provide benefits at not cost to its employees "for [their] lifetimes." 133 F.3d at 401.  Rejecting the employees' argument that the employer had intended to vest their benefits, the court stated: "We have rejected this argument in the past, and we reject it again now.  We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change." 133 F.3d at 401.

*Sprague* has been criticized.  Five judges of the en banc Sixth Circuit dissented.  *Id.* at 406-07, 413; *see also Stearns v. NCR Corp.*, 97 F. Supp. 2d 954, 963 (D. Minn. 2000) ("[T]he *Sprague* decision in effect gives [employers] carte blanche license to offer inducements to employees to waive their rights and then to renege on their promises after the employees have irrevocably done so. Nothing in ERISA requires courts to sanction such an unfair result."). In *Barker v. Ceridian Corp.*, 122 F.3d 628, 638 (8th Cir. 1997), *cert. denied*, 529 U.S. 1109 (2000), the Eighth Circuit found that a conflict between a promise of benefit continuation and reserved amendment rights makes the benefit contract ambiguous, allowing resort to extrinsic evidence to resolve the confusion, and preventing summary judgment for the employer. *See also Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 981 (2d Cir. 1997) ("In this Circuit, to reach a trier of fact, an

Case No. 1:09-CV-1011
Gwin, J.

employee does not have to 'point to unambiguous language to support [a] claim.  It is enough [to] point to written language capable of reasonably being interpreted as creating a promise on the part of [the employer] to vest [the recipient's] . . . benefits.'").[2/]

Although much recommends against the reasoning of *Sprague*, the Court applies it to the instant case.  The Court finds as a matter of law that the 1999 Special Retirement Benefit did not confer lifetime profit sharing or unchangeable life insurance benefits to the Plaintiffs.  As to the Profit Sharing Plan, although the Defendants used the term "lifetime" to describe the benefit, they also provided the following specific warning to 1999 retirees:

> The Profit Sharing Plan continues to include a provision by which the Company may curtail or revoke the plan at any time.  All participation referred to herein is dependent upon the Plan continuing in its present or amended form.

---

[2/]In a treatise from the Federal Judicial Center, *ERISA in the Courts*, Professor Wiedenbeck describes why any retained ability to amend should be carefully scrutinized:

> Because the case law is unsettled, courts may look to ERISA's policies to see if notice of retained amendment authority should negate an SPD promise of lifetime benefits. Three serious considerations strongly suggest that it should not. First, the contradiction in the SPD, however apparent to judges and lawyers, is seldom obvious to and never highlighted for participants. The inconsistency between representations concerning the value of the plan in the future and a reserved power to amend may be imperceptible to participants, especially if it appears within a context of other employer representations touting the plan. Second, focusing on the conscientiousness of the participant overlooks ERISA's policies. An SPD containing such a patent ambiguity is defective; it fails to "reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan." It seems odd to say that participants must bear an additional burden (the costs of investigation or the risks of failing to investigate) because the administrator has violated ERISA. Instead of forcing participants to look behind the SPD when faced with inconsistent terms, they could be permitted to rely on a reasonable interpretation of the document. A reservation-of-rights clause can be read (as the courts do) to qualify representations that the program will be maintained as-is in the future, but the representations may just as reasonably be understood as implicit exceptions to the sponsor's retained amendment authority. Where the SPD ambiguity appears in the context of an employer campaign promoting the promise of lifetime benefits, that latter accommodation seems to be the more natural reading. Finally, consider the employer's conduct and its consequences. Avoiding a self-contradictory SPD is extremely easy—it requires only a careful reading of the summary description itself. The minimal cost of prevention raises a strong inference that any such repugnancy is the product of a deliberate attempt to mislead.

Peter J. Wiedenbeck *ERISA in the Courts* 91-93 (Federal Judicial Center 2008), http://cwn.fjc.dcn/public/pdf.nsf/lookup/ERISA1st.pdf/$file/ERISA1st.pdf.

-10-

Case No. 1:09-CV-1011
Gwin, J.

[Doc. 34-20 at 14.]  Under *Sprague*, this language does not render the "lifetime" promise illusory.

Instead, as the Seventh Circuit reasoned when faced with similar language in *United Mine Workers*

*v. Brushy Creek Coal Co.*, 505 F.3d 764, 767 (7th Cir. 2007):

> As long as the health plan is in effect, the retirees are entitled to benefits until they
> die. . . . If the plan did not create benefits "for life," it would be unclear when the
> benefits ended.  Terminable benefits for life are benefits that go on regardless of the
> age of the worker or how long ago he retired, but that cease if the plan conferring
> those benefits ends.

505 F.3d at 767.

Because the Sixth Circuit has permitted employers to renege on promises to continue to

provide lifetime benefits, the Court finds Plaintiffs' plan claims fail.  *See Sprague*, 133 F.3d at 401

("We see no ambiguity in a summary plan description that tells participants both that the terms of

the current plan entitle them to health insurance at no cost throughout retirement and that the terms

of the current plan are subject to change.")

The Life Insurance Plan language that the Plaintiffs rely upon to provide lifetime benefit is

less specific, stating only that retirees "will automatically receive" insurance or that coverage "will

continue." [Doc. 34-15 at 7, Doc. 34-20 at 15.]  Under *Sprague*, the general reservation of rights

language is sufficient to negate any implicit promise that the life insurance benefit would be

permanent.  Thus, because the Defendants later amended the Plan, the Plaintiffs are entitled only to

the benefits available under the current plan.

The Plaintiffs rely largely on *Yard-Man* and its progeny to support the argument that once

they retired, their benefits became fixed at the 1999 Plan levels.  As the Sixth Circuit has repeatedly

cautioned, however, *Yard-Man*'s relaxed vesting standard most typically applies in the context of

collective bargaining agreements.  *See Reese v. CNH Am. LLC*, 574 F.3d 315, 321 (6th Cir. 2009)

-11-

Case No. 1:09-CV-1011
Gwin, J.

("[W]e assess health-care-benefit promises differently depending on whether the contract stemmed from a CBA or not."); *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 490-91 (6th Cir. 2009) ("When the plan document at issue is a collective bargaining agreement, the interpretive principles outlined in *Yard-Man* govern . . . ."); *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 917 (6th Cir. 2000) (holding that even after *Sprague*, *Yard-Man* is still good law and must be used by courts interpreting collective bargaining agreements).

Moreover, even under the principles of *Yard-Man*, benefits do not automatically vest, especially where the plan or agreement reserves to the employer the right to terminate the plan. *Cf. Noe v. PolyOne Corp.*, 520 F.3d 548, 554 (6th Cir. 2008) (finding that benefits vested when "no limiting language" existed in agreement); *see also Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 581 (6th Cir. 2006) ("Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits."). In this case, unlike those on which the Plaintiffs rely, the Defendants indicated in the portfolio and in the plan documents that the Plaintiffs' benefits could change at any time.

Finally, the Plaintiffs argue that the Profit Sharing Plan is a pension plan and therefore subject to ERISA's anti-cutback rules. *See* 29 U.S.C. § 1054(g). Although the Profit Sharing Plan may very well meet ERISA's definition of a pension plan—specifically a defined-contribution plan—§ 1054(g) applies only to accrued benefits. Here, the Plaintiffs do not dispute that they received all the benefits that had accrued under the Plan during their employment with Farmers and prior to its termination. The Defendants' decision to terminate the Plan and accordingly cease making future, contingent contributions is not a violation of the anti-cutback rule. *See Thornton v. Graphic Commc'ns Conference of the Int'l Bd. of Teamsters Supplemental Retirement & Disability*

-12-

Case No. 1:09-CV-1011
Gwin, J.

*Fund*, 566 F.3d 597, 625 (6th Cir. 2009) (holding that accrued benefit is one earned during employment).

As discussed above in footnote 2 and by other courts of appeals, this Court finds strong argument that *Sprague* was wrongly decided and is disconnected from the reality of the circumstances surrounding employer promises of lifetime benefits. Nonetheless, *Sprague* controls and compels summary judgment for the Defendants.

In sum, because the Defendants expressly reserved the right to amend or terminate the Plans and did so in 2007 and 2008, the Plaintiffs' claim for benefits fails as a matter of law. Accordingly, the Court **GRANTS** the Defendants' motion for summary judgment on this claim.

### B. Breach of Fiduciary Duty

The Defendants also move for summary judgment on the Plaintiffs' claims that the Defendants breached their fiduciary duties. The Plaintiffs allege that the Defendants provided misleading information about Ohio Farmers's ability to terminate the plans at any time. Responding, the Defendants argue that the "undisputed facts establish that no misrepresentation was made." [Doc. 34-1 at 16.]

"The duties charged to an ERISA fiduciary are the highest known to the law." *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002). A fiduciary breaches his duty by providing plan participants with materially misleading information, "regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002) (quoting *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999)). "Misleading communications to plan participants regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support

-13-

Case No. 1:09-CV-1011
Gwin, J.

a claim for a breach of fiduciary duty." *Pirelli Armonstrong*, 305 F.3d at 449.

To preclude summary judgment on this claim, the Plaintiffs must provide sufficient evidence that: (1) that the Defendants were acting in a fiduciary capacity when they made the challenged representations; (2) that these representations constituted material misrepresentations; and (3) that the Plaintiffs relied on those misrepresentations to their detriment. *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 433 (6th Cir. 2006). A misrepresentation is "material" if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire. *Moore*, 458 F.3d at 433. Moreover, "Whether an affirmative misrepresentation was 'material' is a mixed question of law and fact." *Id.* (quoting *Pirelli Armstrong*, 305 F.3d at 449). Finally, "a plaintiff's reliance on the misrepresentation must be 'reasonable.'" *Moore*, 458 F.3d at 433.

Moving for summary judgment, the Defendants argue that none of the documents provided to the Plaintiffs contained a material misrepresentation. As an initial matter, the fact that the Plans do not explicitly guarantee lifetime benefits and do not guarantee that Defendants will not amend the Plans does not relieve the Defendants of potential liability for unlawfully suggesting that they did. In fact, both Plaintiff Griffiths and Plaintiff Collette admitted that they read the specific reservation of rights contained in the 1999 Special Benefit Portfolio but say that they believed this reservation of rights did not apply to 1999 retirees. [Doc. 38-1 at 2, 38-2 at 6.]

The Sixth Circuit addressed a similar situation in *Pirelli Armstrong*. In that case, the employer created an "Optional Pension/Severance" program to encourage early retirement. 305 F.3d at 444. Under this program, employees who retired early would "avoid anticipated increases in the cost of health insurance and other major changes in the employees' health insurance benefits." *Id.*

-14-

Case No. 1:09-CV-1011
Gwin, J.

at 443. The company told the employees they would have these benefits "during retirement," which

an assistant employee relations manager defined as "during their lifetimes and the lives of their

spouses." Id. at 444.

Despite the fact that the plan documents contained reservation of rights language, the Sixth

Circuit held that the employer breached its fiduciary duty to the retirees by providing, "on its own

initiative, materially misleading and inaccurate information about the plan benefits to Plaintiffs in

group meetings and exit interviews." 305 F.3d at 455. Specifically, the employees testified that the

company had told them they would have benefits, "for as long as I live" or "for the rest of my life."

Id. at 448. Because the court found this language materially misleading as to the company's ability

to terminate the plans, it reversed the district court's grant of judgment for the employer.

The court of appeals also explained the effect of a reservation of rights clause on the fiduciary

duty claim:

> As in Unisys [Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896 (3d Cir.
> 1995)], where the Third Circuit found that the reservation of rights provision did not
> protect an employer from liability for a breach of fiduciary duty when the employer
> deliberately fostered the belief that retirement benefits are lifetime benefits, Sprague
> does not stand for the proposition that a reservation of rights provision insulates an
> employer from liability for a breach of its fiduciary duty under ERISA when the
> employer disseminates materially false or misleading information on its own
> initiative about the future benefits of a plan. In short, an employer or plan
> administrator fails to discharge its fiduciary duty to act solely in the interest of the
> plan participants and beneficiaries when it provides, on its own initiative, materially
> false or inaccurate information to employees about the future benefits of a plan.
> Under these circumstances, it is not necessary that employees ask specific questions
> about future benefits or that they take the affirmative step of asking questions about
> the plan to trigger the fiduciary duty. The breach of fiduciary duty occurs when the
> employer or plan administrator on its own initiative provides misleading information
> about the future benefits of a plan.

Pirelli Armstrong, 305 F.3d at 455.

In this case, the Plaintiffs show evidence that they read the "lifetime" in the newsletters and

-15-

Case No. 1:09-CV-1011
Gwin, J.

1999 portfolio and relied on it in choosing to forgo additional years of earnings and accept the company's early retirement benefit.  Moreover, at least some evidence exists that permits an inference—made in the Plaintiffs' favor—that Defendant Ohio Farmers included this "lifetime" language for the express purpose of inducing early retirement.

For example, when the Defendants offered an earlier retirement package in 1997, the Profit Sharing Plan provision stated: "As a retiree under Plan '97, you will continue to participate in the Profit Sharing Plan." [Doc. 35-7 at 4.]  In contrast, the 1999 letters and portfolio provided that early retirees would participate in Profit Sharing Plan "for their lifetime." [Doc. 34-20 at 14.]  In fact, Plaintiff Collette testified that she did not find the 1997 package appealing but took the 1999 package because "it was preserving my right, my lifetime rights, for Westfield life and profit sharing." [Doc. 35-9 at 3.]

Although Ohio Farmers does have some argument that it made its ability to terminate the plans more clear to the 1999 retirees than even the employer in *Pirelli Armstrong* did, this argument goes to the reasonableness of the Plaintiffs' reliance and is thus better suited for trial than for summary judgment.

Accordingly, the Court **DENIES** the Defendants' Motion for Summary Judgment on the Plaintiffs' breach of fiduciary duty claim.

### IV. Conclusion

For the foregoing reasons, this Court this Court **GRANTS IN PART** and **DENIES IN**

-16-

Case No. 1:09-CV-1011
Gwin, J.

**PART** the Defendants' Motion for Summary Judgment.

        IT IS SO ORDERED.


Dated: March 17, 2010                                s/      *James S. Gwin*
                                                     JAMES S. GWIN
                                                     UNITED STATES DISTRICT JUDGE